UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUILLERMINA FRANCISCO,<br><br>                              Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>                              Defendant. | Case No.:  14-cv-2905-BAS (WVG)<br><br>**REPORT AND<br>RECOMMENDATION ON<br>CROSS-MOTIONS FOR<br>SUMMARY JUDGMENT**<br><br>**(Doc. Nos. 14 and 15)** |

## I.

## INTRODUCTION

This is an action for judicial review of a decision of the Commissioner of Social Security ("the Commissioner") denying plaintiff Guillermina Francisco ("Francisco") disability insurance benefits and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 301, *et seq*. The parties have filed cross-motions for summary judgment and the matter is before the undersigned magistrate judge for preparation of a report and recommendation, which will be submitted to the Honorable Cynthia Bashant, U.S. District Judge. *See* 28 U.S.C. § 636; CivLR 72.1(c). For the reasons stated below, the Court recommends that Francisco's motion for summary judgment be granted, that the Commissioner's motion be denied, and that the matter be remanded for further administrative proceedings.

## II.

## BACKGROUND

### A.    Procedural History

On June 20, 2011, Francisco filed a Title II application for a period of disability and disability insurance benefits and a Title XVI application for supplemental security income. (Tr. 144-54.) Francisco claimed to suffer from chronic low back pain radiating to the lower extremities status post fusion at L5-S1, left medial epicondylitis status post bilateral ulnar nerve release, bilateral median neuropathy at the wrists status post bilateral carpal tunnel syndrome release, asthma, hypertension, anxiety, depression, and chronic headaches.  (*Id.*)

Francisco's applications were initially denied on October 20, 2011, and were denied on reconsideration on April 18, 2012. (Tr. 45-74.) Francisco sought further review. On May 31, 2013, Francisco, who was represented by an attorney, appeared and testified at a hearing in San Diego, California before Administrative Law Judge Howard K. Tremblin ("the ALJ"). (Tr. 28-44.) On August 13, 2013, the ALJ issued a written decision finding that Francisco was not disabled and denying Francisco benefits. (Tr. 10-27.) The Appeals Council denied Francisco's appeal on October 6, 2014. (Tr. 1-9.)

Francisco filed this action on December 9, 2014. (Compl., Doc. No. 1.) The Commissioner answered the complaint on April 27, 2015. (Ans., Doc. No. 11.) Francisco filed her motion for summary judgment on June 29, 2015. (Pltf. Mot., Doc. No. 14.) The Commissioner filed her cross-motion on July 29, 2015. (Def. Mot., Doc. No. 15.)

### B.    Medical Records

The administrative record before the ALJ contained the following medical records relating to Francisco's alleged impairments[1]:

Francisco saw Robert E. Scott, M.D. at least seven times between January 17, 2007 and September 24, 2007. (Tr. 578-602.) Dr. Scott noted that Francisco suffered lower back

---

[1] The Court here summarizes only the records relied on by the ALJ in his written decision, and by the parties in their cross-motions, as well those other records that the Court regards as particularly relevant. The Court has reviewed the entire administrative record.

pain following a slip and fall at work on September 22, 2006. (Tr. 598.) Dr. Scott noted that Francisco's situation was complicated by a prior low back injury sustained in the late 1990s, for which Francisco had lumbar fusion surgery. (Tr. 599.) Dr. Scott noted "limited" lumbar spine motion and "generalized lumbar paraspinal tenderness." (Tr. 579.)

Francisco saw David M. Kupfer, M.D. on thirty-four occasions between January 17, 2008 and November 18, 2010. (Tr. 290-410.) On first examining Francisco, Dr. Kupfer noted "carpal tunnel findings" and "ulnar neuropathy," with symptoms worse on the left side than the right. (Tr. 409.) On September 19, 2008, Dr. Kupfer noted that Francisco reported "significant increase in the pain and numbness especially in the left hand." (Tr. 388.) On January 22, 2009, Dr. Kupfer noted that the discomfort was "now significant enough to result in significant sleep disruption." (Tr. 380.) In a preoperative report, dated January 21, 2010, Dr. Kupfer noted that Francisco "admits to marked mood swings with significant periods of depression as a result of the chronic pain in both arms and the difficulty obtaining treatment including the prescribed medication." (Tr. 344.) Dr. Kupfer also noted that Francisco "is plagued with substantial insomnia as a result of this pain … and admits to suicidal ideation." (*Id.*) Dr. Kupfer performed carpal tunnel decompression surgery on Francisco's right arm on February 4, 2010. (Tr. 342.) On May 6, 2010, Dr. Kupfer noted sustained improvement in all symptoms in Francisco's right arm. (Tr. 328.) Dr. Kupfer performed carpal tunnel decompression surgery on Francisco's left arm on June 24, 2010. (Tr. 321.) On September 9, 2010, Dr. Kupfer noted that Francisco was "substantially improved after the surgery for both arms but does have some residual pain," principally in the left wrist. (Tr. 309.) On October 6, 2010, Dr. Kupfer found that Francisco was "capable of resuming her preinjury position albeit in a modified manner." (Tr. 302.) Dr. Kupfer found that Francisco "would be restricted from combined highly repetitive hand and wrist activity such as typing data entry or other comparative behaviors exceeding 30 minutes per hour." (*Id.*) Dr. Kupfer also noted his recommendation that Francisco "be provided with a limited course of psychological counseling given the obvious clinical depression emanating from the chronic pain accentuated by the inappropriate delay in

providing surgical intervention." (*Id.*) On November 18, 2010, Dr. Kupfer opined that maximal medical improvement had been achieved as of September 29, 2010. (Tr. 294.)

On October 5, 2010, Francisco was evaluated by Lawrence S. Pohl, M.D. (Tr. 290-93.) Dr. Pohl found that "the right carpal tunnel and right cubital tunnel have significantly improved." (Tr. 292.) Dr. Pohl noted, however, that Francisco suffered from "mild constant pain in the left hand, wrist and elbow which becomes moderate with repetitive use of the hand." (Tr. 291.) Dr. Pohl found that Francisco's upper extremity symptoms had reached "maximal medical improvement." (*Id.*) Dr. Pohl opined that Francisco could return to work, "although not to her usual and customary duties," as "[s]he would not be able to do repetitive use of the hand for more than 30 minutes out of a 60 minute period." (*Id.*) Dr. Pohl opined that Francisco "should avoid repetitive use of the hands including typing, data inputting, gripping and grasping for approximately 30 minutes in an hour." (*Id.*) Dr. Pohl also concurred with Dr. Kupfer's opinion that Francisco would need "psychological evaluation and possibly some short term psychological treatment." (Tr. 292.)

On November 19, 2010, Francisco saw Luis Sandoval, M.D., at Neighborhood Healthcare in Escondido, California. (Tr. 518-520.) Dr. Sandoval noted that Francisco presented with depression and anxiety. (Tr. 518.) Dr. Sandoval noted that Francisco admitted that "currently she wants to end her life, though she does not have a plan at the moment, but in the past she has tried to overdose on pills and has gotten into car accidents purposefully." (*Id.*) Dr. Sandoval noted past instances of self-harm. (Tr. 519.) Dr. Sandoval noted that, in the previous week, Francisco had "contemplated running [her] car into propane truck, but thought of [her] daughter and decided not to." (*Id.*) Dr. Sandoval noted that Francisco reported a two-month hospitalization for depression, a history of sexual abuse as a teenager, and physical and verbal abuse in her marriage. (*Id.*) Dr. Sandoval concluded that Francisco required immediate hospitalization. (Tr. 520.) Escondido police were called to escort Francisco to hospital. (*Id.*)

Between January 19, 2011 and November 9, 2012, Francisco saw Rogelio Samorano, M.D., also at Neighborhood Healthcare, on over twenty occasions. (Tr. 454-

513.) On January 19, 2011, Dr. Samorano noted that Francisco reported experiencing a "running commentary" of negative audio hallucinations on a daily basis. (Tr. 512.) Dr. Samorano diagnosed Francisco with "major depressive disorder, recurrent, severe with psychotic features." (Tr. 513.) On February 9, 2011, Dr. Samorano noted that Francisco presented with "severe major depression with command auditory hallucinations" and suicidal ideation. (Tr. 511.) Dr. Samorano noted that Francisco was "unresponsive/catatonic for 5 minutes during the visit, not responding to verbal or visual cues." (*Id.*) Emergency services were again called. (*Id.*) Following the February 9, 2011 office visit, Francisco saw Dr. Samorano on over twenty occasions. (Tr. 463-509.) Over that period, Francisco continued to present with auditory hallucinations and a "restricted, dysphoric" affect, but she no longer exhibited suicidal ideation. (*Id.*) Dr. Samorano continued to assess Francisco as suffering from major depressive disorder. (*Id.*) On at least one occasion, Francisco presented to Neighborhood Healthcare outside of her regularly scheduled visits because of feeling "overwhelmed." (Tr. 481.) Dr. Samorano noted that Francisco informed him that she had been raped when she was sixteen and that her oldest daughter was the product of this incident. (*Id.*) Dr. Samorano also noted that Francisco reported that she had been raped by her father while pregnant. (*Id.*) On June 29, 2011, Dr. Samorano completed a "check-the-box"-type mental capacity assessment in which he opined that Francisco had "marked" limitation in twenty areas of functional capacity, grouped under four headings: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 454-56.) "Marked" limitation, for the purposes of Dr. Samorano's assessment, means that "[t]he individual cannot generally perform satisfactorily in this area." (Tr. 454.)

On September 21, 2011, at the request of the Department of Social Security, Francisco was evaluated by Romualdo R. Rodriguez, M.D., a board eligible psychiatrist. (Tr. 437-43.) Dr. Rodriguez noted that Francisco "appear[ed] genuine and truthful" and that there was "no evidence of exaggeration or manipulation." (Tr. 440.) Dr. Rodriguez noted that Francisco reported a history of physical abuse as a child and teenager and a

history of hospitalization, possibly for psychiatric reasons. (Tr. 438.) Dr. Rodriguez noted that Francisco "lives in a house at a campground with her husband" and that "[Francisco] and her husband take care of the campground in exchange for staying in the house." (Tr. 439.) Regarding Francisco's daily activities, Dr. Rodriguez noted:

> [Francisco] uses a ride from others or drives a car, runs errands, goes to the store, cooks and makes snacks, participates in household chores and dresses and bathes herself. Outside activities and hobbies include TV. She can leave home alone, handle her own cash and pay her own bills. She described a good relationship with family, relative, friends, neighbors and others. She denied any other significant activities.

(*Id.*) Dr. Rodriguez noted that Francisco "makes good eye contact and good interpersonal contact" and was "generally cooperative." (Tr. 439-40.) Dr. Rodriguez noted that Francisco was not delusional, that there was no evidence of psychotic thought content and "no current suicidal, homicidal, or paranoid ideation." (Tr. 440.) Dr. Rodriguez noted that Francisco's mood was "depressed" and her affect "sad and tearful." (*Id.*) Dr. Rodriguez noted that Francisco reported feeling "helpless, hopeless, worthless, and guilty." (*Id.*) Dr. Rodriguez diagnosed Francisco with post-traumatic stress disorder, but opined that with proper treatment, Francisco "could easily recover from her symptoms in the next twelve months." (Tr. 441-42.) Dr. Rodriguez found that Francisco was "[a]ble to understand, remember, and carry out *simple* one or two-step job instructions"; "[a]ble to do detailed and *complex* instructions"; "[s]lightly limited in her ability to relate and interact with supervisors, coworkers and the public"; "[s]lightly limited in her ability to maintain concentration and attention, persistence and pace"; "[s]slightly limited in her ability to adapt to the stresses common to a normal work environment"; "[s]lightly limited in her ability to maintain regular attendance in the work place and perform work activities on a consistent basis"; "[s]lightly limited in her ability to perform work activities without special or additional supervision". (Tr. 442-43) (emphasis in original).

On October 4, 2011, Francisco was evaluated by Thomas J. Sabourin, M.D., an orthopedic surgeon. (Tr. 445-49.) Dr. Sabourin noted that Francisco exhibited a

14-cv-2905-BAS (WVG)

"generalized tenderness in the left forearm" (Tr. 447), but that the "severity and duration of her symptoms in the upper extremities [was] disproportionate to the determinable condition" (Tr. 449). Dr. Sabourin noted that Francisco had "no true neurological deficit." (*Id.*) Dr. Sabourin opined that "based on [Francisco's] back problem, she does have some significant limitations." (*Id.*) Dr. Sabourin continued:

> She could only lift and carry 20 pounds occasionally and 10 pounds frequently. She could stand and walk up to six hours in an eight-hour workday and sit for six hours in an eight-hour workday. Push and pull limitations are equal to lift and carry limitations. She could climb, stoop, kneel, and crouch only occasionally. She does have manipulative limitation due to her surgeries. She can do gross or fine manipulation only frequently [sic] using the right or left hand. She has no need for assistive devices.

(*Id.*)

On June 17, 2013, Francisco was evaluated by Thomas A. Schweller, M.D., a neurologist. (Tr. 871-73.) Dr. Schweller noted his impression that Francisco suffered from chronic low back pain, bilateral median neuropathy at the wrists, left medial epicondylitis, chronic depression, chronic headaches and incompletely controlled hypertension. (Tr. 873.) Regarding Francisco's functional capacity, Dr. Schweller opined that:

> [Francisco] would be able to sit, stand, and walk for six hours out of an eight-hour day. She would be able to lift 20 pounds occasionally and 10 pounds frequently, with occasional limits in bending, stooping, and squatting. She would have no kneeling or crawling limitations. She would have no upper extremity fine or gross manipulation limitations … Her headaches do not appear to be neurologic in nature. They do not appear to be typical migraine headaches but appear to be a combination of tension headaches and possibly poorly controlled hypertension. It does appear that she has evidence for depression, which contributes to her condition."

(*Id.*)

## C.    Francisco's Testimony

Francisco testified at a hearing before the ALJ on May 31, 2013. Francisco testified that she was forty-six years old and had a seventh grade education. (Tr. 31.) She testified

that she last worked in 2007. (*Id.*) She testified that her responsibilities in her most recent employment had initially been shipping, receiving and restocking, and that she had subsequently been placed in accounting. (*Id.*) She testified that she stopped working in 2007 after having back surgery and that the decision to terminate her employment was made by her employer. (Tr. 32.) She also testified that she had undergone bilateral surgery on her arms and elbows. (*Id.*)

Francisco testified that, despite the surgery, she still had back pain, as well as chronic pain in her legs, and cramps. (*Id.*) She testified that the pain in her right arm had improved, but that her left hand was sometimes sleepy. (Tr. 32-33.) She also testified to forearm pain. (Tr. 33.) She testified that she is "sometimes" free from pain, but "only when [she is] sleeping." (Tr. 34.)

Francisco testified that she has had migraine headaches "for many years" and as often as "two times a week." (Tr. 33.) She testified that she also has depression and anxiety. (Tr. 34.) She testified that she has sleep apnea and frequently feels tired. (*Id.*) Francisco testified that she takes medication for pain and to help her with her anxiety and depression. (Tr. 33-34.)

Francisco testified that she can lift a gallon of milk with either hand, but "only for a little time." (Tr. 35.) She testified that she sometimes drops things from her left hand. (*Id.*) She testified that she gets cramps in her arms and shoulders when she lifts her hands above her head. (Tr. 35.) She testified that she begins to feel pain after sitting for more than twenty minutes. (*Id.*) She testified that walking causes her pain in her back and legs. (*Id.*) She admitted that it has been several years since she tried to use a keyboard over a prolonged period. (*Id.*)

Francisco testified that she has difficulty concentrating and remembering things. (Tr. 36-37.) She testified that she generally does not have difficulty interacting with people. (Tr. 37.) Francisco testified that she lives with her husband, who works, and her fourteen-year old daughter. (*Id.*) She testified that during the day she stays home, cleans "a little," sits down, walks and waters her plants. (Tr. 38.)

### D.   The Vocational Expert's Testimony

Behnush Barzegarian, a vocational expert, also testified at the hearing. (Tr. 41-43.) The ALJ asked Mr. Barzegarian about two hypotheticals. First, the ALJ asked Mr. Barzegarian to assume "an individual with [Francisco's] age, education, past work[,] who can lift and/or carry ten pounds frequently, 20 pounds on occasion; can sit, stand or walk six hours; occasional postural activity; grasping, fingering, feeling, gross and fine manipulation frequent; no significant mental limits." (Tr. 42.) Mr. Barzegarian testified that the person described in the hypothetical could perform Francisco's past relevant work as an office clerk. (*Id.*)

The ALJ then changed the hypothetical to an individual of the "same age, education, past work, sit, stand, walk; eight pounds occasionally with the right dominant, the left no lifting or carrying; no overhead activity; grasping, fingering, keyboarding is rarely; sitting, standing, walking about 20 minutes at a time with the need to change at will; bending is rarely; because of concentration problems, not able to understand, remember and carry out even simly tasks." (Tr. 42-43.) Mr. Barzegarian testified that no work was available for the individual described in the second hypothetical. (Tr. 43.)

### E.   The ALJ's Decision

The ALJ issued a written decision on August 13, 2013. (Tr. 13-22.) The decision follows the five-step process established by the Social Security Administration for determining whether an individual is disabled.[2] (Tr. 14-15.)

---

[2] *See* 20 C.F.R. §§ 416.920, 404.1520; *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (summarizing five-step process). In the first step of this five-step process, the ALJ must first determine whether the claimant has engaged in "substantial gainful activity." A positive finding at this step disqualifies the claimant from benefits. At the second step, the ALJ determines whether the claimant has one or more "severe" impairments. A negative finding at this step disqualifies the claimant from benefits. At the third step, the ALJ determines whether the claimant's impairment(s) is equal in severity to one of the "listed impairments" under the regulations. If so, then the claimant must be found to be disabled. If not, then the ALJ moves on to step four. Prior to step four, the ALJ must assess the claimant's residual functional capacity ("RFC"), and must determine whether the claimant's RFC permits the claimant to do his or her past relevant work. A positive finding at this step disqualifies the claimant from benefits. If the ALJ finds that that the claimant cannot do his or her past relevant work, then the ALJ must, at step five,

At step one, the ALJ found that Francisco was not engaged in "substantial gainful activity." (Tr. 15.) The ALJ accordingly proceeded to step two.

At step two, the ALJ found that Francisco had the following severe impairments: chronic pain in the lower back and lower extremities, pain in the left arm, and pain in both wrists. (Tr. 15-17.) The ALJ also found that the following claimed impairments were not severe: asthma, hypertension, anxiety, depression, and chronic headaches.[3] (*Id.*) The ALJ accordingly proceeded to step three.

At step three, the ALJ found that Francisco did "not have an impairment or combination of impairments that meets or medically equals one of the listed impairments." (Tr. 17.) The ALJ found that "[n]o treating or examining physician has indicated findings that would satisfy the severity requirements for any listed impairment …. [and] the state agency physicians have opined that the claimant's condition does not meet or equal any listing." (*Id.*) The ALJ accordingly proceeded to step four.

Before addresssing step four, the ALJ found that Francisco had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). (Tr. 17-18.) The ALJ found that:

> [Francisco] can lift and carry 20 pounds occasionally, 10 pounds frequently, stand/walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday with postural limitations including occasional climbing, stooping, kneeling and crouching as well as manipulative limitations including frequent use of the bilateral hands for gross or fine manipulation, and the claimant retains the capacity to perform the work-related mental activities generally required by competitive, remunerative work, and specifically, the claimant retains the ability to understand, carry out and remember simple one-to-two step as well as detailed and complex instructions; with mild limitations in her ability to: interact, relate and respond appropriately to supervisors,

---

consider whether the claimant is capable of doing any other work available in the national economy. If the ALJ makes a negative finding at step five, then the claimant is found to be disabled.

[3] In what appears to be a typographical error, the ALJ listed asthma, hypertension and chronic headaches among the impairments he found to be severe. (Tr. 15.) The ALJ's discussion of these conditions, (Tr. 16) however, makes clear that he actually found these conditions to be non-severe.

14-cv-2905-BAS (WVG)

1
2
3
4
5

> coworkers, the general public and work situations; maintain concentration and attention, persistence and pace; maintain regular attendance in the workplace and perform work activities on a consistent basis; perform work activity without special or additional supervision; and deal with changes and adapt to stresses common in a routine work setting.

6
7
8
9
10
11

(Id.) In making this determination, the ALJ expressly rejected the opinion of Francisco's treating psychiatrist, Rogelio Samorano, M.D., finding that the opinion was in the form of a checklist, was unsupported by objective evidence, and was contradicted by the opinion of "nearly every examining physician of record." (Tr. 21.) The ALJ also found that Francisco's testimony "concerning the intensity, persistence and limiting effects of [her] symptoms [was] not entirely credible." (Tr. 20.)

12
13
14

At step four, the ALJ considered the testimony of the vocational expert and found that Francisco was able to perform her past relevant work as an office clerk. (Tr. 22.) As such, the ALJ found that Francisco was not disabled. (*Id.*)

15

### III.

16

### STANDARD OF REVIEW

17
18
19
20
21
22
23
24
25
26

A district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). The decision of the Commissioner, however, should only be disturbed if it is not supported by substantial evidence or if it is based on legal error. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Substantial evidence is evidence that a reasonable mind would accept as adequate to support the conclusion. *Id.*; *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("[It] is more than a mere scintilla but less than a preponderance.") Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld. *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

27
28

14-cv-2905-BAS (WVG)

# IV.

# DISCUSSION

Francisco contends: (1) that the ALJ erred at step two when he found that Francisco did not suffer from a severe mental impairment; (2) that the ALJ erred at step three when he failed to find that Francisco suffered from a mental impairment that qualified as an affective disorder under the listings; (3) that the ALJ erred in assessing her residual functional capacity by (a) improperly determining that Francisco's testimony was not fully credible, (b) failing to properly assess Francisco's mental impairment, (c) failing to develop the record regarding the opinion of treating physician Robert E. Scott, M.D., and (d) failing to conduct an individualized assessment of the impact of obesity; and (4) that the hypothetical that the ALJ posed to the vocational expert did not accurately reflect Francisco's true residual functional capacity.

Francisco's arguments concerning the ALJ's credibility determination and the ALJ's decision to discount the opinion of Francisco's treating psychiatrist are at the center of each of Francisco's major contentions. The Court will accordingly address these two arguments first and then move on to Francisco's remaining points.

## A.    The ALJ's determination that Francisco's testimony was not fully credible was erroneous.

The Court first addresses Francisco's contention that the ALJ erred by finding Francisco's testimony was not entirely credible. Francisco argues that the ALJ improperly made a general determination regarding Francisco's credibility and failed to provide specific, clear and convincing reasons for discrediting Francisco's testimony. As explained below, the Court finds that the ALJ's credibility determination was erroneous.

 "In assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis." *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). The ALJ initially must determine whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id.* "When an [ALJ] determines

that a claimant for Social Security benefits is not malingering and has provided objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms she alleges, the ALJ may reject the claimant's testimony about the severity of those symptoms only by providing specific, clear, and convincing reasons for doing so." *Brown-Hunter v. Colvin*, 806 F.3d 487, 488-89 (9th Cir. 2015).

"In determining credibility, an ALJ may engage in ordinary techniques of credibility evaluation, such as considering claimant's reputation for truthfulness and inconsistencies in claimant's testimony." *Burch*, 400 F.3d at 680. The ALJ must also consider, as relevant in the particular case, the factors listed in Social Security Ruling 88-13, which include "[t]he nature, location, onset, duration, frequency, radiation, and intensity of any pain," "[p]recipitating and aggravating factors," "[t]ype, dosage, effectiveness, and adverse side-effects of any pain medication," "[t]reatment, other than medication, for relief of pain," "[f]unctional restrictions," and "[t]he claimant's daily activities." Id. Although the ALJ may consider the extent to which the claimant's subjective complaints are supported by objective medical evidence, "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of the pain." *Id.* (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)).

The clear and convincing standard is "the most demanding required in Social Security cases" and "is not an easy requirement to meet." *Garrison v. Colvin*, 759 F.3d 995,1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). To permit meaningful judicial review of the credibility determination, the ALJ must "specify which testimony she finds not credible, and then provide clear and convincing reasons supported by evidence in the record to support that credibility determination." *Brown-Hunter*, 806 F.3d at 488-89; *see also* SSR 96-7p at *4 ("The determination or decision must contain specific reasons for the finding on credibility, supported by evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."). "General findings are

insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998); *see also Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("[T]he ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony.").

Here, the ALJ expressly found that "[Francisco's] medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 20.) This finding satisfied the first step of the credibility analysis. The ALJ also made no finding of malingering. Therefore, before discrediting Francisco's testimony, the ALJ was required to "specify which testimony [he found] not credible, and then provide clear and convincing reasons supported by evidence in the record to support that credibility determination." Brown-Hunter, 806 F.3d at 489.

As an initial matter, the ALJ's highly generalized adverse credibility determination failed to identify the specific statements that the ALJ found unworthy of belief and so did not provide the basic information necessary to ensure meaningful judicial review. The Ninth Circuit has repeatedly instructed that the ALJ must "specify which testimony [the ALJ] finds not credible." *Brown-Hunter*, 806 F.3d at 489; *see id.* at 493 (holding that the ALJ erred by making only a single general finding that "claimant's statements concerning the intensity, persistence and limiting effects" of symptoms were not credible); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1102-03 (9th Cir. 2014) (same). Here, the ALJ wrote that "[Francisco's] statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible" and that "[Francisco's] allegations of disabling pain and limitation are inconsistent with the evidence of record and are, therefore, not fully credible." (Tr. 20-21.) Although Francisco testified to several different physical and mental impairments, the ALJ did not specify which specific parts of Francisco's testimony he discredited. This error alone is fatal to the credibility determination.

The Court also finds that the ALJ failed to identify with sufficient clarity the specific reasons underpinning his decision to discount Francisco's testimony. In her submission to

this Court, the Commissioner identifies several reasons for the ALJ's credibility determination. (Def. Mot. 17-18.) These include a lack of objective medical support for Francisco's allegations of disabling limitation and inconsistencies between Francisco's claims and her "ordinary activities of daily living." (*Id.*)

As the Commissioner concedes, a lack of medical support for a claimant's allegations regarding the extent of her pain or limitations cannot, on its own, suffice to discredit the claimant's testimony. (Def. Mot. at 17, Doc. No. 15-1.) *See Burch*, 400 F.3d at 680. The ALJ's written decision, however, does not identify with specificity any reasons for his credibility determination other than a lack of consistent medical findings. Instead, the ALJ simply stated his credibility determination and then summarized the medical evidence, which included a summary of Francisco's reported daily activities. This was legal error. *See Brown-Hunter*, 806 F.3d at 494 ("[T]he ALJ's written decision reveals that she did not specifically identify any … inconsistencies [between the claimant's testimony and the record]; she simply stated her non-credibility conclusion and then summarized the medical evidence supporting her [residual functional capacity] determination."); *see also Hernandez v. Colvin*, 2014 WL 185742, at *3 (C.D. Cal. Jan. 15, 2014) ("Whether accurate or inaccurate, the 'reasons' gleaned by [the Commissioner] but not specifically and expressly stated by the ALJ as the reason(s) for the credibility determination cannot properly form the basis for a judicial affirmance of the credibility determination.").

Moreover, even assuming *arguendo* that the ALJ did identify an inconsistency between Francisco's testimony and her activities of daily living, the record did not provide grounds to discount Francisco's testimony on this basis. The Ninth Circuit has long recognized that "a specific finding" that "a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting … may be sufficient to discredit an allegation of disabling excess pain." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Molina*, 674 F.3d at 1112-13 (finding that claimant's daily activities including attending church and shopping undermined testimony that that she was incapable of being around people without suffering

panic attacks). The law does not, however, require a claimant to be "utterly incapacitated" before he or she is adjudged disabled. *Id.* The Ninth Circuit therefore has repeatedly cautioned that "the mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001); *see also Garrison*, 759 F.3d at 1016 ("We have repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day."); *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007) (finding no evidence that claimant's activities were transferable to workplace or that claimant engaged in such activities for a substantial part of the day); *Reddick*, 157 F.3d at 722 ("[D]isability claimants should not be penalized for attempting to lead normal lives in the face of their limitations.").

Here, the ALJ did not make specific findings regarding the nature of Francisco's daily activities, the transferability of these activities to the workplace, or whether these activities were inconsistent with Francisco's testimony. Instead, the ALJ simply summarized notes taken by the consultative psychiatric evaluator, Dr. Rodriguez, regarding Francisco's activities:

> Dr. Rodriguez indicated that [Francisco] lives in a house at a campground with her husband and she and her husband take care of the campground in exchange for housing. She continues to drive and runs errands, goes to the store, cooks, makes snacks, and participates in household chores. [Francisco's] hobbies include watching television. She can leave home alone and handle her own cash as well as pay her own bills. [Francisco] described a good relationship with family, relatives, friends, neighbors, and others. She continues to maintain her own personal hygiene and can dress herself.

(Tr. 21.) Neither this summary, nor Dr. Rodriguez's notes themselves, gave the ALJ a valid basis to doubt the credibility of Francisco's testimony. Rather, the references to driving,

running errands, cooking and participating in household chores are the kind of generalized, non-detailed observations that cannot, without more, support an adverse credibility determination.

To the extent that the ALJ relied on Dr. Rodriguez's notation that "[Francisco] and her husband take care of the campground in exchange for staying in the house," (Tr. 439), this was error. Dr. Rodriguez's notation is entirely too ambiguous to provide the ALJ with a basis to doubt the credibility of Francisco's testimony. Dr. Rodriguez's note does not specify what, if anything, Francisco does around the campground. Indeed, it is unclear, on this record, whether Francisco does work around the campground or whether she simply benefits from the work that her husband does. When asked by the ALJ about her daily activities, Francisco testified that she "stay[s] home ... clean[s] a little ... sit[s] down ... walk[s] ... [waters her] plants." (Tr. 38.) The ALJ did not further develop Francisco's testimony on this point.

The Commissioner's reliance on *Burch v. Barnhart* is also misplaced. In *Burch*, the Ninth Circuit reviewed an ALJ's finding that a claimant's daily activities—which included caring for her personal needs, cooking, cleaning, shopping, and interacting with family members—were inconsistent with her allegations of disabling limitation. 400 F.3d at 680-681. The Ninth Circuit held that "[a]lthough the evidence of [the claimant's] daily activities may also admit an interpretation more favorable to [the claimant], the ALJ's interpretation was rational, and '[w]e must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.'" *Id.* (quoting *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)).

This case is readily distinguishable from *Burch*. Critically, in *Burch* the ALJ made a specific finding that the claimant's testimony about her daily activities "suggest[ed] that [the claimant] [was] quite functional." *Id.* at 680. Here, in contrast, the ALJ made no finding whatsoever regarding the nature of Francisco's daily activities or the extent to which those activities were inconsistent with Francisco's testimony. The ALJ in *Burch* also parsed the claimant's testimony and provided specific reasons for discrediting specific

pieces of testimony. *Id.* at 680-81. The ALJ in this case, in contrast, made a single generalized determination that Francisco's testimony was not fully credible. Further, in *Burch* the ALJ relied on the claimant's own direct testimony regarding her daily activities. *Id.* In this case, the ALJ ignored Francisco's testimony regarding her daily activities and relied instead on Dr. Rodriguez's notes. Finally, in *Burch*, as the Ninth Circuit expressly pointed out, the ALJ "did not solely rely on the minimal objective evidence and [the claimant's] daily activities in discrediting her testimony … [but] made additional specific findings to support his credibility determination," including detailed findings regarding the claimant's failure to seek treatment for her ailments. *Id.* at 680-81. Here, in contrast, the ALJ relied solely on the lack of objective medical evidence and on the alleged inconsistencies between Francisco's testimony and her reported daily activities.[4]

Francisco's reported daily activities therefore provided the ALJ with no proper basis to discredit Francisco's testimony. As the Commissioner concedes, a lack of objective support for the severity of a claimant's complaints cannot alone support an adverse credibility determination. (Def. Mot. at 17, Doc. No. 15-1.) The ALJ therefore failed to provide specific, clear and convincing reasons for disbelieving Francisco's testimony, and the ALJ's credibility determination must be set aside.

**B.    The ALJ failed to provide specific and legitimate reasons for rejecting the opinion of Francisco's treating psychiatrist.**

The Court next addresses Francisco's contention that the ALJ improperly disregarded the opinion of her treating psychiatrist, Dr. Samorano, who opined that Francisco had "marked" impairment in numerous areas of mental functioning. As explained below, the Court finds that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for disregarding Dr. Samorano's opinion.

"Generally, the opinion of a treating physician must be given more weight than the

---

[4] In an appropriate case, of course, an inconsistency between a claimant's testimony and his or her activities of daily living could, without more, support an adverse credibility determination. The sparse record and insufficient findings here means that this is not such a case.

opinion of an examining physician, and the opinion of an examining physician must be afforded more weight than the opinion of a reviewing physician." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th Cir. 2014); 20 C.F.R. § 404.1527(c). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008). In determining how much weight to afford to a treating physician's opinion, the ALJ must consider, among other things, the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician, the "[n]ature and extent of the treatment relationship," the "[s]upportability of the physician's opinion with medical evidence, and the consistency of the physician's opinion with the record as a whole. 20 C.F.R. § 404.1527(c)(1)-(6); *see generally Orn*, 495 F.3d at 631 (discussing factors that ALJ should consider in weighing opinion of treating physician). "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012-13.

Here, the ALJ gave three related reasons for disregarding Dr. Samorano's opinion. First, the ALJ found that Dr. Samorano's diagnosis of mental impairment was "based primarily on [Francisco's] self-reports of voices." (Tr. 21.) Second, the ALJ found that the opinion was in the form of a checklist and was unsupported by objective evidence. (*Id.*) Third, the ALJ found that Dr. Samorano's opinion was "contradicted by … nearly every examining physician of record." (*Id.*) None of these reasons are supported by substantial evidence.

The first reason that the ALJ gave for discrediting Dr. Samorano's opinion is that Dr. Samorano's diagnosis was based primarily on Francisco's self-reported auditory hallucinations. Under Ninth Circuit law, an ALJ may discount a treating provider's opinion when the "treating provider's opinions are based 'to a large extent' on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible." *Ghanim*,

763 F.3d at 1162; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ properly rejected treating physician's opinion was proper where opinion was based largely on claimant's reports of pain and ALJ made adverse credibility determination). However, "when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Ghanim*, 763 F.3d at 1162. Similarly, an ALJ may not discount a physician's opinion on the grounds that it is based primarily on the claimant's own subjective reports when the ALJ has not provided specific, clear and convincing reasons for discrediting the claimant's testimony. *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the record does not support the ALJ's finding that Dr. Samorano inappropriately relied on Francisco's self-reported auditory hallucinations. First, review of Dr. Samorano's treatment notes demonstrates that the psychiatrist relied on his own observations, diagnoses and prescriptions, in addition to Francisco's consistent reporting of auditory hallucinations. (Tr. 454-513.) Second, as already discussed, the ALJ's adverse credibility finding was not proper, and there is no evidence of any sort that Francisco falsely reported her symptoms to her psychiatrist. Indeed, the government's own psychiatric evaluator, Dr. Rodriguez, found Francisco to be "genuine and truthful," and her account to be free from any evidence of "exaggeration or manipulation." (Tr. 440.) This part of the ALJ's reasoning accordingly must be set aside.

The second reason that the ALJ gave for disregarding Dr. Samorano's opinion is that the opinion was in the form of a checklist unsupported by objective evidence. (Tr. 21.) This reason was also improper. It is quite true that "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole or by objective medical findings." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). However, an ALJ may not discredit a treating physician's opinion, even a conclusory one, if it is supported by the record as a whole and by the physician's treatment notes. *See Burrell*, 775 F.3d at 1140 ("Dr. Riley's assessments are of the 'check-box' form and contain almost no detail or explanation. But the record supports Dr. Riley's opinion's

because they are consistent both with claimant's testimony at the hearing and with Dr. Riley's own extensive treatment notes which … the ALJ largely overlooked."); *Esparza v. Colvin*, — F. App'x —, 2015 WL 7567408, at *2 (9th Cir. Nov. 25, 2015) ("Although the treating physician's opinions were in the form of check-box questionnaires, that is not a proper basis for rejecting an opinion supported by treatment notes. The treating physician's extensive notes are consistent with the check-box forms and provide the basis for his opinion.")

Here, Dr. Samorano's opinion was indeed in the form of a check-box list and contained no supporting detail or explanation. However, in finding that Dr. Samorano's opinion lacked objective support, the ALJ largely ignored or overlooked Dr. Samorano's own treatment notes and those of Dr. Samorano's colleagues at Neighborhood Healthcare. The evidence that the ALJ overlooked these treatment notes is compelling. Notably, the ALJ wrote that Dr. Samorano's notes "revealed no significant abnormalities" with "no suicidal/homicidal ideation." (Tr. 21.) But Dr. Samorano's notes are to the contrary. On February 9, 2011, for instance, Dr. Samorano noted that Francisco presented with "severe major depression with command auditory hallucinations," accompanied by suicidal ideation. (Tr. 511.) Dr. Samorano diagnosed Francisco with "major depressive disorder, recurrent, severe with psychotic features." (Tr. 513.)  During this visit, Francisco became "unresponsive/catatonic for 5 minutes … not responding to verbal or visual cues" and emergency services were called. (Tr. 511.) The ALJ did not mention this episode. The ALJ also failed to mention the medical notes of two of Dr. Samorano's colleague at Neighborhood Healthcare, Dr. Rodarte and Dr. Sandoval, both of which indicated suicidal ideation. (Tr. 518-21.) Clearly, the ALJ "cherry picked" Dr. Samorano's notes, choosing to accept only those that aligned with his conclusion and ignoring or rejecting those that ran contrary.

The third reason that the ALJ gave for disregarding Dr. Samorano's opinion is that it was "contradicted by … nearly every examining physician of record." (Tr. 21.) This is not an accurate characterization of the record. Most tellingly, while Dr. Samorano and Dr.

Rodriguez disagreed as to the extent of Francisco's mental impairment, Dr. Rodriguez did not, by any measure, give Francisco a clean bill of mental health. Dr. Rodriguez noted, for instance, that Francisco's mood was "depressed" and her affect "sad and tearful." (Tr. 440.) Dr. Rodriguez noted that Francisco reported feeling "helpless, hopeless, worthless, and guilty." (*Id.*) Based on his evaluation, Dr. Rodriguez diagnosed Francisco with post-traumatic stress disorder and opined that Francisco was "slightly limited" in numerous areas of mental functioning. (Tr. 441-43.) Evidence in the record concerning treatment by other medical providers also speaks to Francisco's mental difficulties. This includes the treatment notes of Dr. Sandoval, who, like Dr. Samorano, diagnosed Francisco with major depressive disorder, recurrent, severe with psychotic features. (Tr. 519.)  Also relevant were the evaluations of Dr. Pohl and Dr. Kupfer, who both diagnosed Francisco with post-injury or pain related depression. (Tr. 290, 293.) Dr. Schweller also found "evidence of depression." (Tr. 873.) In evaluating an ALJ's decision, courts must weigh "both the evidence that supports and the evidence that detracts from [the ALJ's] conclusion." *Reddick*, 157 F.3d at 720. The Court finds that the ALJ failed to consider probative evidence that contradicted his conclusion regarding Dr. Samorano's opinion.

For the reasons stated, the Court finds that the ALJ's rejection of Dr. Samorano's opinion was not supported by the record.

### C.   The ALJ was not under a duty to develop the record by obtaining a treating source opinion from Dr. Robert E. Scott

The Court next addresses Francisco's argument that the ALJ failed to meet his duty to develop the record by requesting a treating source opinion of limitations from Dr. Robert E. Scott. As explained below, the Court finds that the ALJ was not under a duty to request a treating source opinion from Dr. Scott.

The ALJ in a social security case has an independent "duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996) (quoting *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). This duty extends to the represented as well as to the unrepresented claimant, but

is heightened when the claimant is unrepresented or may be mentally ill and unable to protect her own interests. *Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001). The ALJ's duty to develop the record is not unlimited and is triggered only by "[a]mbiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence." *Id.*; *see also Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001). "The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record." *Id.*

Francisco argues that the length of Dr. Scott's treating relationship with Francisco and the "complexities of Francisco's medical history" imposed on the ALJ a duty to request a medical source statement from Dr. Scott. (Pltf. Mot. 17.) Francisco does not, however, explain how the extensive and detailed medical records provided by Dr. Scott were ambiguous or inadequate to allow for proper evaluation of the evidence. Moreover, the Court's own review of these medical records does not disclose any significant ambiguities or gaps that required the ALJ to further develop the record. *See McLeod v. Astrue*, 640 F.3d 881, 884 (9th Cir. 2010) (holding that ALJ had no duty to request more information from treating physicians where substantially all the medical records from their treatment of the claimant were before the ALJ and there was nothing unclear or ambiguous about those records).

The Court therefore finds that the ALJ had no duty to obtain a treating source opinion from Dr. Scott. The ALJ's failure to discuss Dr. Scott's records *at all* is another matter. Should the District Court adopt this Court's recommendation and remand this matter to the SSA, the ALJ should give due consideration to the the treatment records provided by Dr. Scott that are already in the record. *See Marsh v. Colvin*, 792 F.3d 1170, 1172-73 (9th Cir. 2015) ("Because a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them."); *cf. Howard*

*ex rel. Wolff v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) ("[T]he ALJ is not required to discuss evidence that is neither significant nor probative.").

### D.   The ALJ did not err by failing to explicitly address Francisco's obesity.

The Court next addresses Francisco's contention that the ALJ erred by not considering the impact of Francisco's obesity on Francisco's functioning. As explained below, the Court finds that the ALJ was not required to explicitly address Francisco's obesity.

The Ninth Circuit has held that, under certain circumstances, an ALJ is required to include a claimant's obesity in the analysis of the claimant's functional capacity, regardless of whether the claimant raises obesity as a disabling factor. *See Celaya v. Halter*, 332 F.3d 1177, 1181-83 (9th Cir. 2003); *see also* Social Security Ruling 96-8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). On the other hand, "the mere presence of a mention in the record that the claimant was obese is insufficient to require the ALJ to explicitly consider the issue in his or her written opinion." *Aguilar v. Colvin*, 2014 WL 1653109, at *7 (S.D. Cal. April 22, 2014) (Benitez, J.) (citing *Burch*, 400 F.3d at 681-84).

In *Celaya*, the Ninth Circuit looked to three factors in holding that the ALJ had a duty to consider the impact of obesity on the claimant's other impairments: (1) obesity was raised implicitly in the claimant's reported symptoms; (2) the claimant's obesity was close to the listing criterion[5] and was a condition that could exacerbate her reported illnesses; (3) the claimant was illiterate and unrepresented. *Id.* at 1182. In *Burch*, however, the Ninth Circuit carefully distinguished and limited its earlier holding. 400 F.3d at 681-84. The *Burch* court found that that the record before it "[did] not indicate that [the claimant's] obesity exacerbated her other impairments." *Id.* "[M]ore significantly," the court noted, the

---

[5] As *Celaya* explained, obesity was a listed impairment until 1999, when the Social Security Administration removed it from the listing of impairments. 332 F.3d at 1181 n.1 (citing 64 Fed. Reg. 46, 122). "Obesity may still enter into a multiple impairment analysis, but only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system." *Id.*

claimant was represented by counsel before the ALJ. *Id.* at 682. The court also noted that the ALJ had at least acknowledged the evidence regarding the claimant's obesity. *Id.* at 684. The court therefore rejected the claimant's argument that the ALJ had failed to properly consider the impact of her obesity on her other impairments. *Id.*; *see also Burton v. Astrue*, 310 F. App'x. 960, 961 n.1 (9th Cir. 2009) (rejecting argument that ALJ failed to adequately consider obesity where ALJ did consider obesity in his overall assessment and claimant failed to specify how his obesity limited his functional capacity); *Hoffman v. Astrue*, 266 F. App'x. 623, 625 (9th Cir. 2008) ("The ALJ's failure to consider [the claimant's] obesity in relation to his [residual functional capacity] was proper because [the claimant] failed to show how his obesity in combination with another impairment increased the severity of his limitations.").

In this case, the ALJ's failure to address Francisco's obesity was not reversible error. First, Francisco was represented by counsel before the ALJ and did not raise obesity at the hearing or in her disability application. Second, although several medical providers noted that Francisco was obese, Francisco fails to point to evidence showing that her obesity exacerbated her other symptoms. Third, even before this Court, Francisco "has not pointed to any evidence of functional limitations due to obesity which would have impacted the ALJ's analysis." *Burch*, 400 F.3d at 683.

The Court therefore finds that the ALJ did not commit error by failing to address Francisco's obesity in his written decision.

### E.   The ALJ's hypothetical was defective.

The Court's determination that the ALJ improperly discredited Francisco's testimony and improperly rejected Dr. Samorano's opinion means that the Court, of necessity, agrees with Francisco's contention that the hypothetical that formed the basis of the vocational expert's decisive opinion was defective. (Pltf. Mot. at 21-22, Doc. No. 14-1.) The Court additionally finds that the ALJ's hypothetical failed to incorporate significant limitations on Francisco's fine manipulation abilities found by Francisco's treating physician, Dr. Kupfer, who opined that Francisco should "be restricted from combined

highly repetitive hand and wrist activity such as typing data entry or other comparative behaviors exceeding 30 minutes per hour." (Tr. 302.) Dr. Kupfer performed surgery on both of Francisco's arms and treated Francisco on numerous occasions over more than two years. Dr. Kupfer was therefore in a strong position to evaluate Francisco's arm and wrist limitations. Nevertheless, the ALJ did not discuss why he might have disregarded Dr. Kupfer's opinion—an opinion in which Dr. Pohl, an evaluating physician, specifically concurred. (Tr. 291.) The failure to incorporate into the hypothetical the significant and highly material limitation identified by Dr. Kupfer was clear error.

### F.    The ALJ's errors were not harmless.

The Court must next apply harmless error principles to determine whether Francisco was prejudiced by the ALJ's errors. *Marsh*, 792 F.3d at 1172; *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006); *Batson*, 359 F.3d at 1195-97. Under these principles, an ALJ's errors "are harmless if they are inconsequential to the ultimate nondisability determination." *Marsh*, 792 F.3d at 1173. "[A] reviewing court cannot consider an error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." *Id.*; *see also McLoed*, 640 F.3d at 888 ("[W]here the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether re-consideration is necessary. By contrast, where harmlessness is clear and not a borderline question, remand for reconsideration is not appropriate.").

Here, the ALJ erred by finding that Francisco was not entirely credible and also erred by discounting the opinion of Francisco's treating psychiatrist, Dr. Samorano. Neither error can be considered harmless. First, the ALJ's erroneous credibility determination cannot be considered harmless. Francisco testified to several serious physical and mental limitations, including difficulty sitting, walking, lifting, fine motor problems, and difficulty concentrating and remembering things. (Tr. 35-39.) The limitations described in this testimony were reflected in the second hypothetical that the ALJ put to the vocational expert and the vocational expert testified that no work was available for an individual with

such limitations. (Tr. 42-43.) The ALJ's error in assessing Francisco's credibility therefore was not harmless.

The ALJ's error in discounting Dr. Samorano's opinion also was not harmless. Dr. Samorano opined that Francisco had marked mental impairments in a number of functional areas. If the ALJ had fully credited this opinion, he would have been required to make a step two finding that Francisco had a severe mental impairment. Even if Francisco had not prevailed at step three,[6] the crediting of Dr. Samorano's opinion would have changed the ALJ's residual functional capacity assessment and may have led to a finding that Francisco was disabled.

Finally, the ALJ's failure to incorporate into the hypothetical the limitations on repetitive hand and wrist activity found by Dr. Kupfer cannot be considered harmless error. Notably, the vocational expert's answer to the ALJ's second hypothetical indicates that the the ALJ may well have found Francisco disabled had the limitations identified by Dr. Kupfer been included in the ALJ's residual functional capacity assessment. *See Robbins v. Social Security Admin.*, 466 F.3d 880, 886 (9th Cir. 2006).

## G.  Remand for further proceedings is appropriate.

The Court next addresses the question of remedy. Two options are available: (1) remand for further proceedings, or (2) remand for an award of benefits. Because Francisco's entitlement to benefits is not clearly established on the present record, remand for further proceedings is therefore appropriate.

The Ninth Circuit has held that "[a] district court may reverse the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing, but the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015). A district court may remand directly for an award of benefits only when: "(1) the record has

---

[6] Because the ALJ will reconsider the weight to be given to Dr. Samorano's opinion on remand, the Court does not here address whether the ALJ would be required to find Francisco disabled at step three if Dr. Samorano's opinion were fully credited.

been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons for rejecting evidence; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020. Even if these requirements are met, the court retains "flexibility" to remand "on an open record for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Dominguez*, 808 F.3d at 408. The district court only abuses its discretion when "all factual issues in the record have been resolved, overwhelming evidence establishes that the claimant is disabled, and the government points to no evidence to contrary." *Id.* at 407; *see also Burrell*, 775 F.3d at 1141.

Here, remand for further proceedings is appropriate because the evidence of Francisco's disability is not "overwhelming" and material factual issues remain unresolved. Although the ALJ's generalized credibility determination was erroneous, the record suggests that facts could be developed through further proceedings that may entitle the ALJ to discredit certain parts of Francisco's testimony. The Commissioner asserts, for instance, that "the record show[s] that Francisco and her husband "acted as campground hosts in exchange for housing." (Def. Mot. at 18, Doc. No. 15-1.) The Court disagrees with the Commissioner's characterization of what the record shows and also finds that the ALJ failed to make sufficiently clear whether he relied on this "fact" in making his credibility determination. Dr. Rodriguez's notation, however, certainly raises a question regarding Francisco's daily activities, and the ALJ may address this question, with the benefit of a more fully developed record, on remand.

Similarly, the ALJ may, with or without further development of the record, be able to articulate specific and legitimate reasons that would entitle him to afford less weight to the Dr. Samorano's check-box opinion than would otherwise be required. The record, for example, discloses certain inconsistencies between Dr. Samorano's opinion and his treatment notes. For instance, Dr. Samorano consistently noted that Francisco's appearance

was appropriate and her behavior cooperative. (Tr. 454-513.) Dr. Samorano also noted that Francisco's insight and judgment was generally fair. (Id.) In his opinion, however, Dr. Samorano found that Francisco has marked limitation in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 455.) The Court does not find, at this stage, that this inconsistency would alone be sufficient reason for the ALJ to discredit Dr. Samorano's opinion. Such a determination is properly made by the ALJ on remand.

In short, the Court is unable to conclude that the record is "free from conflicts, ambiguities [and] gaps" and that Francisco's "entitlement to benefits is clear." *Treichler*, 775 F.3d at 1103-04. Remand is therefore appropriate.

## IV.

## CONCLUSION

For the reasons stated, the Court recommends that Francisco's motion for summary judgment be granted, that the Commissioner's motion for summary judgment be denied, and that the matter be remanded to the ALJ for further proceedings.

**IT IS ORDERED** that no later than February 23, 2016, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than March 1, 2016.

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal.

**IT IS SO ORDERED.**

Dated:  February 8, 2016

_____

Hon. William V. Gallo
United States Magistrate Judge

14-cv-2905-BAS (WVG)